IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **S&B ENGINEERS AND** | § | |
| **CONSTRUCTORS, LTD.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:04-CV-0150-L |
| | § | |
| **ALSTOM POWER, INC.,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM ORDER AND OPINION

Before the court are S&B Engineers and Constructors, Ltd.'s Motion to Vacate Arbitration Award, filed January 27, 2004; and Movant's Motion and Notice of Motion Requesting Status Conference, filed September 19, 2006.  After careful consideration of the motions, briefs, record, appendix and applicable law, the court **denies** S&B Engineers and Constructors, Ltd.'s Motion to Vacate Arbitration Award, and **denies as moot** Movant's Motion and Notice of Motion Requesting Status Conference.

## I.  Background

This case was initially filed by S&B Engineers and Constructors, Ltd. ("S&B") against Alstom Power, Inc. ("Alstom") on January 27, 2004, as an action to vacate an arbitration award brought pursuant to the Federal Arbitration Act ("FAA" or "Act").  The underlying dispute stems from the performance of a subcontract agreement ("Agreement") between Alstom and S&B for the installation and erection of mechanical and piping components at the Midlothian Extension Project,

**Memorandum Opinion and Order - Page 1**

located in Midlothian, Texas. Alstom served as the general contractor, and S&B served as one of its subcontractors on this project.

During the project, a contract dispute arose between the parties, and on November 9, 2001, S&B initiated an arbitration under Article 48(b) of the parties' Agreement by filing a Demand for Arbitration with the American Arbitration Association. The arbitration was conducted in Washington, D.C., during the weeks of June 2, June 9, and June 16, 2003, before a three-member panel of arbitrators. The members of the panel were Alan H. Kent, Chairman; Howard G. Goldberg, and George C. Martin, Jr. On October 30, 2003, the panel issued its Award of Arbitrators ("Award"), providing for a net principal payment to S&B in the amount of $1,364,405.

On January 27, 2004, S&B filed this action to vacate the arbitration award, pursuant to 9 U.S.C. §§ 6 and 10, in the United States District Court, Northern District of Texas, Dallas Division. Two days later, on January 29, 2004, Alstom filed an Application to Confirm Arbitration Award ("Virginia action") in the United States District Court for the Eastern District of Virginia, Alexandria Division ("Virginia court"). On February 6, 2004, S&B filed an Application for Preliminary Injunction, seeking to enjoin Alstom from further proceeding in the Virginia action pending resolution of S&B's motion to vacate the arbitration award in this action.

On February 11, 2004, the court issued an order denying S&B's Application for Preliminary Injunction on mootness grounds, as the Virginia court had issued a stay order on February 9, 2004. This court also questioned *sua sponte* whether venue was proper in this district in light of certain language contained in the parties' Agreement, and directed the parties to brief the issue. The court, on October 19, 2004, held that venue in this judicial district was appropriate. As a result of this order, the Honorable James C. Cacheris transferred the Virginia action involving the parties to this

district on October 21, 2004.   The case filed in Virginia was received in this district on November 3, 2004, and was designated as a separate action, Civil Action No. 3:04-CV-2370-L.

In its motion to vacate, S&B contends that the Panel severely restricted the presentation of its case and, in the end, denied S&B any recovery on its principal claim for an equitable adjustment of the contract price.   S&B asserts the award should be vacated on specific statutory grounds, namely:  (1) the arbitrators "were guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy"; and (2) the award was "procured by . . . undue means" and was a product of "evident partiality."   Motion to Vacate at 3 (citing 9 U.S.C. §§ 10(a)(1) and (3)).   The specific factual grounds asserted by S&B in its motion are: (1) the Panel refused to permit S&B to introduce evidence that was critically necessary to the proof of its claim; and (2) the chairman of the panel had a personal financial stake in the panel's ruling excluding this evidence.

While S&B *quotes* from subparts 1, 2, and 3 of the FAA, it *cites* only to subparts 1 and 3. The quoted language with respect to "evident partiality" is part of the ground stated in subpart 2. *See* 9 U.S.C. § 10(a)(2).   Accordingly, from what the court can ascertain, S&B seeks vacatur of the award on the first, second, and third grounds of the section 10(a) of the FAA, and it will address all three bases.[1]

---

[1]The court apologizes for the delay in ruling on this motion.   Administratively, this case was not initially listed, as it should have been, on certain reports that inform the court of pending motions and matters. Second, the Appendix in this case is quite voluminous, well over 5,000 pages.  Although S&B suggests that "an exhaustive review of the record" is not necessary, *see* Movant's Brief in Support of Motion to Vacate Arbitration Award ¶ 61, the court did not accept this suggestion, as it had to be assured that nothing was overlooked; thus, the court has spent considerable time reviewing the record because of the nature and complexity of the case and the issues raised.   It turns out that much of the information in the record is not necessary for the court to reach its decision.   Accordingly, the court "cuts to the chase" in this opinion, rather than engage in an esoteric and erudite discussion of the legal issues.

## II.  **Legal Standard**

Under the FAA, "[j]udicial review of an arbitration award is extraordinarily narrow and [a court] should defer to the arbitrator's decision when possible."  *Antwine v. Prudential Bache Secs. Inc.*, 899 F.2d 410, 413 (5th Cir. 1990); *see also Gateway Techs. v. MCI Telecomms. Corp.,* 64 F.3d 993, 996 (5th Cir. 1995).  A court may not vacate an arbitration award based on mere errors in interpretation or application of the law, or mistakes in factfinding.  *See United Paperworkers, Int'l Union AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 356 (5th Cir. 2004).  A party may move to vacate an arbitration award in the following instances:

(1)     where the award was procured by corruption, fraud, or undue means;

(2)     where there was evident partiality or corruption in the arbitrators, or either of them;

(3)     where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)     where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

As S&B appears to seek vacatur on grounds 1, 2, and 3, the court sets forth the legal standard as it relates to each.  For the actions of an arbitrator

[t]o constitute misconduct requiring vacation of an award, an error in the arbitrator's determination must be one that is not simply an error of law, but which so affects the rights of a party that it may be said that [the party] was deprived of a fair hearing. Under Federal law, misconduct apart from corruption, fraud, or partiality in the arbitrators justifies reversal only if it so prejudices the rights of a party that it denies the party a fundamentally fair hearing.

**Memorandum Opinion and Order - Page 4**

*Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 399 (5th Cir. 2006) (internal quotation marks and citations omitted).  For one urging vacatur on the ground of evident partiality, the party bears an "onerous burden," and must produce specific facts to show that the alleged partiality is "direct, definite, and capable of demonstration rather than remote, uncertain, or speculative."  *Mantle v. Upper Deck Co.*, 956 F.Supp. 719, 729 (N.D. Tex. 1997) (citation omitted).  In a nondisclosure case, however, "an arbitrator selected by the parties displays evident partiality by the very failure to disclose facts that might create a reasonable impression of the arbitrator's partiality.  The evident partiality is demonstrated from the nondisclosure, regardless of whether actual bias exists."  *Positive Software Solutions, Inc. v. New Century Mort. Corp.*, 436 F.3d 495, 502 (5th Cir.), *reh'g en banc granted*, 449 F.3d 616 (2006).  Finally, with respect to "undue means," this term "connotes behavior that is immoral if not illegal[,] or otherwise in bad faith."  *Matter of Arbitration Between Trans Chem. Ltd. and China Nat'l Mach. Imp. and Exp. Corp.*, 978 F.Supp. 266, 304 (S.D. Tex. 1997) (citations omitted), *aff'd*, 161 F.3d 314 (5th Cir. 1998).  Moreover, a party asserting this ground to set aside an award "must demonstrate that the improper behavior was (1) not discoverable by due diligence, (2) materially related to an issue in the arbitration, and (3) established by clear and convincing evidence."  *Id.*

### III.  Analysis

#### A.  Misconduct in Refusing to Hear Evidence Pertinent and Material to the Controversy

The crux of S&B's argument regarding this ground revolves around the alleged exclusion of Exhibit C261 at the arbitration hearing.  Although the court usually does not cite in extended detail from a party's brief, especially given the repetitive nature of the quoted language, it does so

in this instance to capture the complete essence of S&B's arguments regarding Exhibit C261and

testimony "related to" or that "tracks" the exhibit:

21. In preparing to prove its case, the difficulty faced by S&B from the outset was the extremely fragmented nature of its claim. The damage it had suffered on this project had consisted of "death by a thousand cuts." There were hundreds of instances of delayed drawings, tardy or deficient deliveries of equipment and material, "repossessions" of equipment and belated responses to RFI's [Requests for Information], each of which had had a distinct impact on a discrete aspect of S&B's work. To prove all of this in a comprehensible and convincing manner was a daunting challenge.

22. The person whom S&B planned to call upon to meet this challenge was David Taylor, S&B's project manager and principal fact witness, who had personally participated in the events that had disrupted S&B's work and had personally directed the costly adjustments by which S&B had attempted to deal with these problems. Plainly, however, it would have been impossible for Mr. Taylor to present such testimony in an intelligible or convincing manner without some kind of written or graphic summary of these myriad events which would serve both to assist his own recollection and to aid the panel in remembering and organizing the testimony he was to give.

23. In advance of the hearing, therefore, Mr. Taylor personally prepared, with the help of two other S&B personnel, a complete list, in the form of abbreviated descriptions, of all the numerous separate problems occurring on the project that might have had an effect on S&B's performance of its work. In order to give this list a semblance of organization, he chose to superimpose these notations on an as-built version of the project schedule which showed the planned and actual duration of each of the discrete activities comprising the project. A version of this latter document, which differed from the version used by Mr. Taylor only insofar as the several project activities were listed in a different order, had been prepared by S&B and presented to Alstom approximately two years earlier in connection with negotiation of possible change orders. Later, at the arbitration hearing, this previously produced document was received in evidence without any objection on the first day of the hearing and marked as Exhibit C137. The document prepared by Mr. Taylor, which was to become the center of so much controversy, consisted of nothing more than a slightly reordered copy of Exhibit C137 on which he had added, along the right-hand margin, his notes referring to each of the events about which he planned to testify.

24.   Both Exhibit C137, which had been furnished to Alstom years earlier and was received without objection at the hearing, and the document prepared by Mr. Taylor, which eventually became known as Exhibit C261 for identification, are set out in the Appendix to this brief.  As the court will see, the only difference between them, other than the different order in which the project activities are listed, consists of the notes on the right-hand margin which were added by Mr. Taylor.  At the bottom of the first page, for example, it can be seen that, alongside the activity listed as "Install CCW Coolers," Mr. Taylor has placed the notations "RFI 39 - 4 days," "OS&D 2 - 75 days," "Impact to Schedule item 2 - Coolers repossessed and returned 4-28-01," "Recv. [drawing] Books 11/29/00 to 12/04/01," and "Recv. Book Revisions 1/20/01 to 3/1/01."

25.   Although all these notations were understandable to anyone who had been involved in the project and had witnessed the steady stream of "RFI's," "OS&D's [Overage, Shortage and Damage]" and "Impacts to the Schedule" reports which S&B had furnished to Alstom, such cryptic phrases obviously would not have been understandable to the panel without an explanation of their meaning by Mr. Taylor.  The purpose of placing these notations on Exhibit C261, therefore, was not to offer these as evidence or indeed to prove anything.  Rather, they were meant to serve only as an outline of the evidence that would be presented through the testimony of Mr. Taylor – in other words, to give some order to that testimony, to remind Mr. Taylor and his counsel of what his testimony should cover, and to remind the panel of what had been established by that testimony.  It was, in other words, a classic example of a purely demonstrative exhibit illustrating a witness's testimony.

26.  This is not to say that [Exhibit C261] was insignificant or unimportant to S&B.  Mr. Taylor's testimony was intended to provide the principal support for S&B's entire claim.  The role contemplated for the document that became Exhibit C261 was to make that testimony understandable, convincing and memorable – in other words, to transform what would otherwise seem a disconnected stream of random complaints and anecdotes into a coherent account of continuous malfeasance by Alstom and resulting losses to S&B.  It was in this sense crucial to the proper presentation of S&B's claims.  As Alstom's counsel himself would later observe during the argument over his demand that S&B be forbidden to use this exhibit, it would have been "the heart of their case."

27.   Exhibit C261 was produced to Alstom's counsel three days before the start of the hearing and a week before Mr. Taylor would be called to testify.  This was done pursuant to paragraph IV of the original pre-hearing order of April 23, 2002, which, as noted

above, required production of demonstrative exhibits "at least three business days in advance of their use at the hearing."

. . .

29.  On the first day of the hearings, the panel announced that it did not want the proceeding "to get bogged down by technical objections" and reminded the parties of its earlier ruling to the effect that the normal "evidentiary rules and procedural rules of the court are not applicable here."  With one very prominent exception, objections to evidence were thereafter consistently overruled by the Chairman, with the observation that valid objections would simply be taken into account in assessing the weight of the evidence.  The sole exception made by the Chairman and the panel to this permissive approach would be S&B's proposed Exhibit C261, the critical exhibit whose exclusion is now the subject of this petition.

30.  This exhibit was introduced by S&B on the third day of the hearings and the first day of Mr. Taylor's testimony.  The document was offered initially only as a demonstrative exhibit, although later, after the Chairman had suggested it might also be treated as a summary of project records, S&B's counsel alternatively offered to introduce it into evidence.  Alstom's counsel, however, immediately announced that he would "object to either use."  Reiterating his characterization of the document as an expert "scheduling analysis" that supposedly should have been disclosed by S&B with its experts' reports, he renewed his demand that S&B's claim be dismissed or, in the alternative, that he be given two weeks additional time to prepare and undertake his cross-examination of Mr. Taylor and to present whatever rebuttal witnesses he might wish to present in response to Mr. Taylor's testimony.

31.  S&B's counsel of course pointed out that this document was in no sense a "scheduling analysis" or any other kind of expert analysis; nor did it contain any information that was in any way new to Alstom.  It was simply a copy of a document, Exhibit C137, which had already been admitted in evidence and which had been in Alstom's possession for over two years, on which a percipient witness, Mr. Taylor, had made notations referring to a series of other documents, such as "OS&D's," "RFI's," and "Impacts to the Schedule" reports, all of which had also been in Alstom's possession since at least the conclusion of the project.

32.  These arguments, however, were rejected by the panel.  Accepting Alstom's characterization of this exhibit and ignoring its own previous ruling that all proffered evidence would be admitted, the panel ruled that S&B would not be allowed to use the exhibit unless Alstom's counsel was given at least two weeks additional time to prepare to cross-examine Mr. Taylor and present rebuttal witnesses

**Memorandum Opinion and Order - Page 8**

with respect to any matter covered by Mr. Taylor's testimony concerning the exhibit. There ensued much further argument and discussion of exactly what such a delay would entail and whether, because of scheduling problems, such a two-week delay might actually turn into a lengthy adjournment of the hearings. S&B's counsel mentioned that, in that event, S&B might consider withdrawing the exhibit if this were the only way to avoid such an adjournment. During the course of this discussion, the Chairman clarified the panel's ruling by stating it was meant to apply, not only to the exhibit itself, but also to any examination or testimony which would "track" Mr. Taylor's notations on the exhibit or which would attempt in any other way to introduce into evidence "essentially what is on Exhibit 261." Thus faced with a Hobson's choice between a drastic limitation on the presentation of S&B's case and yet another potentially lengthy delay in the resolution of its claim, S&B's counsel "temporarily" withdrew the exhibit and agreed to try to muddle through the examination of Mr. Taylor without it. The panel then decided to hold its ruling in abeyance until it had heard more of the testimony.

33. After trying for several hours to elicit Mr. Taylor's account of the relevant events without using [Exhibit C261] or referring to the items listed therein, S&B's counsel concluded that it was impossible to present S&B's case under these restrictions and again requested that he be allowed to use the exhibit in conducting the rest of the examination. Alstom's counsel renewed his objection, and the panel thereupon reaffirmed its ruling that neither the exhibit nor any testimony relating to its content could be introduced except on the condition that Alstom be permitted at least two weeks to prepare its cross-examination and rebuttal. S&B's counsel then attempted to explore with the panel whether there might be some way to accommodate such a two-week delay in Alstom's presentation of part of its case within the current hearing schedule by reshuffling the other witnesses so that even with such a delay, the proceedings might be able to finish by the scheduled end date of June 19. The Chairman rebuffed this suggestion, however, pointing out that, under the panel's ruling and because of the importance of the material covered by Exhibit C261, the major portion of Alstom's cross-examination and rebuttal testimony would have to be postponed, thus creating "a likelihood it is going to exceed the current end date for this arbitration." The Chairman also made clear that he intended to be very liberal in permitting Alstom's counsel to decide exactly which parts of his cross-examination and rebuttal evidence would be deferred.

34.  These comments of the Chairman made it clear to all parties that the two-week postponement granted to Alstom for the presentation of its case would necessarily preclude finishing the hearings within the currently allotted time period.  By now it had also become obvious that, because of other commitments of both counsel and the members of the panel, any continuation of the hearings beyond that time would require an adjournment until at least November, and that the minimum condition being imposed by the panel on the use of [Exhibit C261] was therefore a five-month continuance of the hearings.  Faced with this prospect, and having already endured one previous lengthy continuance, S&B's counsel refused this condition and withdrew the exhibit.

35.  S&B then proceeded to present the remainder of Mr. Taylor's testimony within the constraints imposed by the panel. Attempting to provide some sort of description of what had occurred on the project without seeming to "track" the content of Exhibit C261, they [sic] inevitably produced a disjointed account which lacked any real structure or organization and inevitably exhibited many gaps and omissions, particularly with respect to showing the precise impact of each of Alstom's misdeeds on S&B's work. Although only the panel itself can say, much of the persuasive force of the testimony was also undoubtedly lost.  As one of the arbitrators himself observed, Exhibit C261 and Mr. Taylor's accompanying testimony would have been "a powerful weapon" in S&B's presentation of its case, and S&B was effectively disarmed by its exclusion.

36.  After concluding Mr. Taylor's account of events on the project, S&B presented the testimony of its three damage experts without any serious objection by Alstom's counsel.  The witnesses offered three alternative methods of damage estimation, all of which reached similar conclusions to the effect that S&B had suffered damages ranging between $6,183,031 and $6,209,253.  Alstom presented a single damage expert who estimated S&B's damage to be $4,321,603.

37.  Alstom's fact witnesses then testified, among other things, that none of Alstom's derelictions – late drawings, "repossessed" equipment, etc. – had actually had any adverse impact on S&B's productivity or caused it any harm.  The Chairman indicated, at one point during this testimony, that he was in agreement with this assessment, stating that "the arbitrators have never seen a single schedule . . . reflecting any of these various impacts."  In rebuttal, S&B recalled Mr. Taylor in the hope of now introducing some of the evidence on this issue that it had been precluded from introducing earlier in the proceedings.  Using Exhibit

C137, the as-built schedule already received in evidence which was identical to the excluded Exhibit C261 except for the order of the listed activities and the notes of Mr. Taylor, counsel again tried to examine him about the impact of Alstom's breaches of the subcontract on S&B's performance.

  38. Alstom's counsel immediately objected, observing that this testimony had a "striking similarity" to the testimony on Exhibit C261 which the panel had previously excluded. The Chairman chimed in with the comment that the testimony was also "getting into an area that perhaps should have been covered by someone who was qualified as a scheduling expert." Alstom's counsel then offered the additional objection that, if this testimony were allowed, he would be required to recall one of his witnesses from France and for that purpose would need another continuance. The panel finally ruled that "it would be prejudicial to the respondent to allow Mr. Taylor to testify" to any matters not already covered on direct examination, and on that basis, once again violating its own initial ruling that all relevant evidence would be admitted, ordered an end to this line of questioning. S&B made no further attempts to introduce evidence of the impact of Alstom's wrongdoing.

Movant's Brief in Support of Motion to Vacate Arbitration Award ¶¶ 21-27, 29-38 (citations to Record omitted).

  By the plain and unequivocal language of the statute, to prevail on this ground, a party must establish that the panel refused to hear evidence pertinent and material to the controversy. Notwithstanding S&B's characterization of the panel's ruling regarding Exhibit C261, the panel did not refuse to hear pertinent and material evidence, and it did not exclude such, as S&B contends. The evidence did not come in because of a choice S&B made. After much "to and fro" between the parties, the panel ruled that it would allow Alstom a continuance to prepare for or respond to Exhibit C261, or S&B could proceed without the use of Exhibit C261. S&B chose to proceed because a continuance, due to conflicts in schedules, may have well resulted in a five-month delay in resumption of the hearing, and S&B believed such a delay would legally prejudice it. S&B, as the record plainly reveals, ultimately withdrew Exhibit C261. The decisions to first proceed with

Exhibit C261 and later withdraw it were strategic choices made by S&B.  S&B asserts that it was faced with a Hobson's choice between a severe restriction on the presentation of its case and "a potentially lengthy delay in the resolution of its claim."  The court does believe that S&B was faced with a Hobson's choice.  While the choice S&B made had risks or disadvantages, of which S&B was obviously aware, the court cannot say that S&B had no meaningful choice.  Litigation, by its nature, requires litigants to make strategic decisions that affect their interests.  S&B made a choice, and that choice ultimately did not allow it to obtain the result it desired.

This court cannot understand why S&B did not opt for a continuance in light of the importance it attaches to Exhibit C261, and the critical factual testimony that would "relate to" or "track" Exhibit C261.  S&B argues that reports about the financial instability and possible insolvency of Alstom or its parent company played a significant role in its decision that a continuance would be highly prejudicial to its interests.  The court has no way of knowing whether this was in fact the case, or a mere afterthought, as the record of the arbitration hearing does not reflect this.  Further, the affidavit of Mr. John B. Clark, S&B's lead trial counsel throughout the course of arbitration, states that S&B was persuaded to go forward in part because of persistent predictions or reports that Alstom or its parent company were on the brink of insolvency or bankruptcy.  This affidavit, however, was not executed until January 22, 2004, well after the arbitration hearing had concluded and just in time for the filing of S&B's motion to vacate.  S&B made a choice that failed to produce the desired result; however, it was not faced with a Scylla and Charybdis situation.[2]  In such a situation, the only result is certain death, regardless of the choice

_____

[2]According to Greek mythology, Scylla was originally a beautiful nymph who was turned into a monster by Circe, an enchantress.  Glaucus, a sea god, fell in love with Scylla; however, the feelings were not mutual, and she wanted no part of him.  When Scylla rebuffed Glaucus's efforts to spark her, he enlisted the aid of Circe to persuade Scylla that she should love him.  Circe, however, had ideas of her own and tried

**Memorandum Opinion and Order - Page 12**

made; there is no other alternative.  This was not the case with S&B.  The court is convinced that, in light of the panel's ruling, or intended ruling regarding Exhibit C261 and testimony that "tracked" or "related to" it, S&B should have opted for a continuance.  It rejected a continuance, which was its right to do; however, it has no right now "to cry foul" in light of its actions.

Determinations by the panel regarding pre-arbitration disclosures, whether Exhibit C261 was a "scheduling analysis" or rose to the level of an "expert analysis," the decision to allow Alstom a continuance to prepare for and respond to Exhibit C261 if S&B was going to use it, and the rulings made by the panel to ensure, in its view, that all evidence was presented in an orderly fashion and in a way to ensure fairness all related to interpretations or applications of the law.  The arbitrators were in a better position than this court to address these matters.  Moreover, the court cannot vacate an award based on incorrect legal or factual rulings.  A court, however, may vacate an award if there is a manifest disregard of the law by an arbitrator.  *Kergosien*, 390 F.3d at 355.  As formulated by the Fifth Circuit:

> [M]anifest disregard for the law means more than error or misunderstanding with respect to the law.  The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.  Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing principle but decides to ignore or pay no attention to it.

---

to convince Glaucus to love her instead of Scylla.  When Glaucus spurned Circe's amorous efforts, she became enraged and turned Scylla into a monster to spite Glaucus.

    After being turned into a monster, Scylla lived in a cave overlooking the Strait of Messina, which separates the island of Sicily from Italy.  Immediately opposite the cave where Scylla lived was the whirlpool Charybdis.  When mariners navigated the Strait of Messina, they were faced with the equally repugnant alternatives of either (1) being devoured by Scylla, or (2) being sucked into and drowned by the deadly waters of the whirlpool Charybdis.

**Memorandum Opinion and Order - Page 13**

*Id.* (external quotation marks and citation omitted).  Evidence in this case does not establish a manifest disregard of the law.  Moreover, S&B did not assert this ground as one to vacate the Award.

S&B repeatedly contends that C261 and C137 are the same exhibit except for the order of the listed activities and Mr. Taylor's notes on C261.  S&B minimizes the importance of these differences.  Obviously, the "insignificant changes" in the two exhibits had a profound effect on the testimony of Mr. Taylor, who was to present critical testimony in support of S&B's claim, was rendered ineffective without the use of Exhibit C261, at which time counsel for S&B renewed his request to use Exhibit C261.  If Exhibits C137 and C261 were identical, except in a minor way, the court cannot understand why Mr. Taylor could not have used Exhibit C137 to aid and develop his testimony.  That he could not do this convinces the court of the effect of C261 and why the panel ruled as it did with respect to C261.  Contrary to S&B's contention, the differences between the exhibits are not nearly as innocuous as it would have this court believe.  Moreover, the court has reviewed the notes made on Exhibit C261.  The notes range from minor to quite extensive, at least insofar as the testimony that would be elicited related to the notes.  In light of the importance attributed to Exhibit C261 by S&B, this court cannot even say that the panel misapplied the law with respect to the conditions it placed on the use and testimony that "related to" or "tracked" Exhibit C261.  In any event, the court is convinced that the panel is not guilty of misconduct in refusing to hear evidence pertinent and material to the controversy between S&B and Alstom.

### B.  Evident Impartiality

S&B contends that Chairman Kent had a personal financial stake in his rulings because of his cancellation fee policy, and that such policy established "evident partiality" in the arbitration within the meaning of the statute.  The court disagrees.

The resume of Chairman Kent contained a "Compensation" section that included his cancellation fee policy.  According to such policy, if an arbitration hearing was canceled less than thirty days prior to the date the hearing was to commence, he was entitled to receive one-half of his daily fee for each day of the hearing that was canceled.  For example, if a hearing was scheduled to last ten days, Chairman Kent was to receive $825 ($\frac{1}{2}$ of his daily rate) per each day of cancellation of the scheduled hearing if the requisite thirty-day notice was not provided.  That Chairman Kent had such a cancellation fee is simply too slender of a reed to support S&B's contention that evident partiality existed.

First, the cancellation fee was a categorical requirement; it applied to all parties to an arbitration.  Obviously, if this fee applied to one party only, the court would have serious concerns about the policy.  There is no evidence that the cancellation fee would not also apply to Alstom.  Under S&B's approach, an arbitrator would have to be disqualified merely because of such cancellation fee policy.  The cancellation fee policy simply does not establish, or even suggest, evident imparitality.  The court is aware through its experience that some arbitrators charge a cancellation fee, as do many other professionals.  That Arbitrators Martin and Goldberg did not charge such a fee is of no moment, and does nothing to establish evident partiality.

Second, this was not a case of "hide the ball."  Chairman Kent's resume, which set forth the cancellation fee policy, was provided to the parties at the time the arbitrators were selected in early 2002.  S&B was aware of the fee cancellation policy, initially; however, the record *does not* reflect that S&B raised any objection at that time regarding the policy, which is when it should have

objected to the policy.  A party "cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court."  *Gateway Techs.*, 64 F.3d at 998 (quoting *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir. 1993)); *Wellman v. Writers Guild of Am., West, Inc.*, 146 F.3d 666, 673 (9th Cir. 1998) ("It is well settled that a party may not sit idly through an arbitration proceeding and then collaterally attack that procedure on grounds not raised before the arbitrators when the result turns out to be adverse.").[3] S&B has thus waived its right to assert bias on the part of Chairman Kent as a ground to set aside the Award.

Third, this was not a nondisclosure case, that is, one in which the arbitrator failed to disclose any facts that might create a reasonable impression of his partiality.  In a case where the parties select the arbitrator and the arbitrator fails to disclose such facts, evident partiality exists.  *See Positive Software Solutions,* 436 F.3d at 505.  *Positive Software*, however, does not apply to this case, as  there was not a failure to disclose.  S&B's contention of bias is based on speculation and uncertainty, at best, and is therefore insufficient to establish evident partiality.  *Mantle*, 956 F.Supp. at 729.

### C.  Undue Means

Although an oblique reference is asserted regarding "undue means," S&B produces no evidence that Alstom procured the Award through immoral or illegal behavior, or in bad faith, *see Trans Chem.*, 978 F.Supp. at 304, or that the arbitrators used undue means to make the award it did. At most, S&B establishes that the arbitration panel made some rulings that it did not like, or that the panel may have incorrectly applied the law.  Assuming such errors were made in interpreting and

---

[3]S&B contends that it objected "very early in the proceedings" regarding the cancellation fee policy. S&B did arguably raise this issue in November 2002.  It was raised only after the chairman made a ruling to which S&B disagreed.  If a potential for bias existed, it existed when the arbitrators were selected in March 2002.  As the cancellation fee policy applied to all parties, an adverse ruling against S&B does not suddenly transform the matter into a situation that establishes evident partiality on the part of the arbitrator.  Frankly, the court believes this issue to be a red herring and more of an afterthought on S&B's part.

applying the law, such errors fall well below the necessary threshold to constitute undue means. S&B's contention that the Award was procured by undue means is without merit and cannot serve as a basis for vacatur of the Award.

### IV.  <u>Miscellaneous</u>

Before the court is Movant's Motion and Notice of Motion Requesting Status Conference, filed September 19, 2006.  In light of the court's ruling on S&B Engineers and Constructors, Ltd.'s Motion to Vacate Arbitration Award, Movant's Motion and Notice of Motion Requesting Status Conference is moot, and the court **denies** the motion.

### V.  <u>Conclusion</u>

For the reasons stated herein, S&B has failed to establish that the Award should be vacated on any of the grounds it asserts.  Accordingly, the court **denies** S&B Engineers and Constructors, Ltd.'s Motion to Vacate Arbitration Award, and **denies as moot** Movant's Motion and Notice of Motion Requesting Status Conference.

**It is so ordered** this 2nd day of October, 2006.

_Sam A. Lindsay_
Sam A. Lindsay
United States District Judge